

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00182-CV

CROSSTEX NORTH TEXAS
PIPELINE, L.P.

APPELLANT

V.

ANDREW GARDINER AND
SHANNON GARDINER

APPELLEES

----------

## FROM THE 431ST DISTRICT COURT OF DENTON COUNTY
## TRIAL COURT NO. 2008-40133-362

----------

## OPINION

----------

## I. Introduction

In six issues, Appellant Crosstex North Texas Pipeline, L.P. appeals the trial court's judgment awarding Appellees Andrew and Shannon Gardiner over $2 million in damages for negligent nuisance. We reverse and remand.

## II. Background

Between 1997 and 2002, the Gardiners bought two adjacent tracts of property—a sixty acre tract and a thirty-five acre tract—next to the horse farm in Denton County where they worked so they could ride their horses, run their cattle, enjoy the peace and quiet, and hold the land as a long-term investment for development. Farm-to-Market Road 1385 (FM 1385) borders the Gardiners' land on two sides.

In 2005, Crosstex, which gathers, transports, and delivers natural gas to public utilities and other interstate pipelines, bought around twenty acres on FM 1385 across from the Gardiners' land. In 2006, it obtained a pipeline easement from the Gardiners and then built on its land a compressor station that became operational in May 2007. The Gardiners sued Crosstex for intentional and negligent nuisance, negligence in the installation and operation of the compressor station, and gross negligence. The trial court granted a directed verdict to Crosstex on the negligence cause of action, and ten of twelve jurors found Crosstex liable for negligent nuisance and awarded the Gardiners $2,042,500 in damages. This appeal followed.

## III. Evidentiary Sufficiency

In its first issue, Crosstex argues that the evidence is legally and factually insufficient to support the jury's finding that it negligently created a nuisance. The Gardiners respond that Crosstex was negligent in owning a station that created a nuisance for the area in which it was located.

2

## A. Standards of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)

3

(op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

**B.  Negligent Nuisance**

A nuisance "is a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities."  *Barnes v. Mathis*, 353 S.W.3d 760, 763 (Tex. 2011) (citing *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269 (Tex. 2004)). An actionable nuisance may arise from an invasion of another's interests attributable to activity that is intentional, negligent, or abnormal and out of place in its surroundings.  *Mathis v. Barnes*, 377 S.W.3d 926, 930 (Tex. App.—Tyler 2012, no pet.); *see also City of Tyler v. Likes*, 962 S.W.2d 489, 503–04 (Tex. 1997).  Although not all nuisances are grounded in negligence, when negligence has created or contributed to the creation of a nuisance, the plaintiff must allege and prove a legal duty owed to the plaintiff, a breach of that duty by the defendant, and damage proximately resulting from the breach.  *Sage v. Wong*, 720 S.W.2d 882, 885 (Tex. App.—Fort Worth 1986, writ ref'd n.r.e.); *Wales Trucking Co. v. Stallcup*, 465 S.W.2d 444, 447 (Tex. Civ. App.—Fort Worth) ("[W]here the act or condition in question can become a nuisance only by reason of the negligent manner in which it is performed or permitted, no right of recovery is shown independently of the existence of negligence." (quoting 41 Tex. Jur. 2d

4

591, § 17)), *rev'd*, 474 S.W.2d 184 (Tex. 1971);[1] *see Weingarten Realty Investors v. Universal Servs. Co.*, No. 01-96-01400, 1997 WL 689435, at *6 (Tex. App.—Houston [1st Dist.] Oct. 23, 1997, pet. denied) (not designated for publication) (stating same); *Columbian Carbon Co. v. Tholen*, 199 S.W.2d 825, 828 (Tex. Civ. App.—Galveston 1947, writ ref'd) (stating same). [2]

---

[1]In *Stallcup*, by the time of the trial, the plaintiffs had abandoned any claim based on negligence; at the conclusion of the trial, the jury found, among other things, that the trucking company had notice of the damage resulting from the nuisance and continued the nuisance after having such notice, and we held that a nuisance was created regardless of the care exercised. 465 S.W.2d at 445–46, 448. That is, we essentially concluded that this nuisance fell under the strict liability, or abnormal-and-out-of-place, theory of nuisance. *See id.* at 448. The supreme court disagreed with our resolution, concluding that despite the severe dust that covered the plaintiffs' house "like snow," when the trucking company's temporary activity—around 825 round-trips over a four-month period—involved using a public road, the facts did not warrant a holding of nuisance without fault. 474 S.W.2d at 185–87, 189 (noting that there was no unlawful, malicious, or negligent conduct in the case).

[2]In its third issue, Crosstex argues that the trial court's judgment should be reversed because there was no finding that Crosstex's use of its property was unreasonable. However, the elements of negligent nuisance do not include unreasonable use. *Sage*, 720 S.W.2d at 885; *see City of Princeton v. Abbott*, 792 S.W.2d 161, 166 (Tex. App.—Dallas 1990, writ denied) (op. on reh'g) (stating that when an invasion is intentional, liability depends upon whether it is unreasonable); *Bily v. Omni Equities, Inc.*, 731 S.W.2d 606, 612 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) ("When the [nuisance] invasion is intentional, liability depends upon whether the invasion was unreasonable. If the invasion is unintentional, liability depends upon whether the defendant's conduct was negligent, reckless, or abnormally dangerous." (citations omitted)); *see also* 16 Allen Gardner, *Texas Practice Series: Elements of an Action* § 41:1 (2013) (linking "unreasonable" with intentional nuisance); Restatement (Second) of Torts § 822 (1979) (same); Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 12.2B (2012) (omitting any mention of unreasonable use in pattern jury charges for both negligent and intentional private nuisance). We overrule Crosstex's third issue.

Liability for a negligent activity simply involves doing what a person of ordinary prudence would not have done or failing to do what a person of ordinary prudence would have done in the same or similar circumstances. *See Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998). Likewise, liability for negligent nuisance depends on whether the defendant acted as a person or party of ordinary prudence would have under the same circumstances in a legitimate use of his property. *See Gulf, C. & S.F. Ry. Co. v. Oakes*, 94 Tex. 155, 163, 58 S.W. 999, 1002–03 (1900) (holding that railroad company was not liable for creating a negligent nuisance when it planted Bermuda grass that spread to neighboring property and facts failed to show that this was not a legitimate use of its property); *see also Turner v. Big Lake Oil Co.*, 128 Tex. 155, 157–58, 96 S.W.2d 221, 221–22 (1936) (holding that for the plaintiffs to recover because the oil-well-operating defendants "permitted salt water to overflow their land, kill the vegetation, and pollute the water of their livestock, 'they must allege and prove some specific act of neglect or must allege and prove that the water polluted was a water course'"); *Humble Pipe Line Co. v. Anderson*, 339 S.W.2d 259, 260, 265 (Tex. Civ. App.—Waco 1960, writ ref'd n.r.e.) (holding that negligence was an essential element of the plaintiffs' nuisance cause of action against pipeline company for its pipeline having leaked and polluted their water well because pipeline did not constitute a nuisance per se);[3] *Tex. Lime Co. v. Hindman*, 300 S.W.2d 112, 122 (Tex. Civ. App.—Waco

---

[3]A nuisance per se is an act, occupation, or structure that is a nuisance at

6

1957) ("[I]t has been held that where a thing is not a nuisance per se but can become a nuisance only by reason of the negligent manner in which it is performed or permitted, no right of recovery is shown independently of the existence of negligence."), *aff'd*, 157 Tex. 592, 305 S.W.2d 947 (1957).

## C. Analysis

With regard to their negligence claim, the Gardiners pleaded,

> Defendant has a duty to use due care in the use of its property or the conduct of its business to avoid injury to others. Defendant's actions in installing and operating a gas compressor station that is extremely loud and causes vibrations and a roaring noise is a breach of this duty, which has proximately caused, continues to cause, and will in the future cause injury to Plaintiffs.

With regard to their private nuisance claim, the Gardiners alleged,

> Defendant's intentional and unreasonable and/or negligent actions have created a permanent private nuisance damaging Plaintiffs' Tracts. Defendant's actions are regular and constant and likely to continue. Alternatively, Defendant's actions have created a temporary private nuisance damaging Plaintiffs' Tracts. Defendant's actions have created a condition that substantially interferes with Plaintiffs' use and enjoyment of their land. The interference is

---

all times, under any circumstances, and in any location or that violates a state statute or municipal ordinance declaring the activity to be a nuisance per se; neither the lawful use of property nor the lawful conduct of a business is a nuisance per se. *Baker v. Energy Transfer Co.*, No. 10-09-00214-CV, 2011 WL 4978287, at *6 (Tex. App.—Waco Oct. 19, 2011, pet. denied) (mem. op. on reh'g); *Maranatha Temple, Inc. v. Enter. Prod. Co.*, 893 S.W.2d 92, 100 (Tex. App.—Houston [1st Dist.] 1994, writ denied). A nuisance in fact is "'an act, occupation, or structure that becomes a nuisance by reason of its circumstances or surroundings.'" *City of Dallas v. Jennings*, 142 S.W.3d 310, 316 n.3 (Tex. 2004) (quoting *Maranatha Temple*, 893 S.W.2d at 100). In *Baker*, the Waco court upheld summary judgment for the gas company on the plaintiffs' negligence and nuisance claims when, among other things, none of the plaintiffs' affidavits addressed the breach of any duty. 2011 WL 1978287, at *4–7.

7

substantial and would cause unreasonable discomfort or annoyance to a person of ordinary sensibilities attempting to use and enjoy the land. Defendant's actions are unreasonable under the circumstances. Defendant's actions have caused Plaintiffs' Tracts to be devalued, have caused Plaintiffs annoyance, personal discomfort and inconvenience, and have lessened their enjoyment of Plaintiffs' Tracts.

Immediately before the charge conference, the trial court granted a directed verdict to Crosstex on the Gardiners' negligence claim, stating, "[C]ounsel has been able to cite the Court to no authority which creates a duty under a common-law negligence cause of action under the circumstances presented. So a nuisance cause of action will be the only cause of action submitted to the jury."

The record reflects that, having granted the directed verdict on the negligence claim, the trial court also had doubts about submitting the negligent nuisance issue, observing during the charge conference that he did not see a duty but would nonetheless submit the question to the jury.[4] The trial court presented the following question (Question 2) on negligent nuisance to the jury:

---

[4]The threshold inquiry in a negligence-based case is whether the defendant owes a legal duty to the plaintiff, and the plaintiff must establish both the existence and the violation of a duty owed to the plaintiff by the defendant to establish liability in tort. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). The determination of a duty involves the balancing of a variety of factors, including the risk, foreseeability, and likelihood of injury, and the consequences of placing the burden on the defendant. *Allen Keller Co. v. Foreman*, 343 S.W.3d 420, 425 (Tex. 2011). The test for foreseeability is what a party should, under the circumstances, reasonably anticipate as a consequence of its conduct. *Foster v. Denton ISD*, 73 S.W.3d 454, 465 (Tex. App.—Fort Worth 2002, no pet.). Duty is a question of law determined from the facts surrounding the occurrence in question. *Centeq*, 899 S.W.2d at 197; *see also*

8

Did Crosstex negligently create a nuisance as to the 95-Acre Tract?

A "nuisance" is a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities.

A party "negligently" creates a nuisance if they fail to use ordinary care, that is, fail to do that which a person or party of ordinary prudence would have done under the same or similar circumstances or doing that which a person or party of ordinary prudence would not have done under the same or similar circumstances. "Ordinary care" means that degree of care that would be used by a person or party of ordinary prudence under the same or similar circumstances.

## 1. Before the Compressor Station: February 2005–January 2006

From February 2005 to January 2006, Crosstex sought a pipeline easement across the Gardiners' land for its North Texas Pipeline, a twenty-four inch transmission pipeline that would run 130 miles from Tarrant County to Paris, Texas. The Gardiners' property, bounded by FM 1385 at the corner that connected 380 and 455 (the end of the Tollway), was pasture, and Andrew ran his cattle on it. Andrew said that before the compressor station was built, he had enjoyed being out on his property in the mornings before work, during his lunch hour, and after work, riding his colts or working on fences until it got close to

---

*Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006). *But cf. Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 395 (Tex. 1991); 70 Tex. Jur. 3d *Tort Liability* § 8 (2014) (stating that whether a duty exists between the parties is a question of law when all of the essential facts are undisputed but that when the evidence does not conclusively establish the pertinent facts or the reasonable inferences to be drawn therefrom, the question becomes one of fact for the jury).

9

dark. Andrew had and continued to have an agricultural exemption on the property.

JEH Stallion Station, the commercial racehorse breeding farm where Andrew and Shannon worked, was located on the other side of the Gardiners' property.[5] A flea market and an RV park were located adjacent to FM 1385, and some residences were located on nearby Mustang Road and Cotton Trail.

Andrew testified that before the compressor station started operating, his property was peaceful and quiet, with the sounds of an occasional car, birds, calves, "just the usual country sounds." G.A. Moore, who lived on Mustang Road on property adjacent to the tract Crosstex purchased in 2005, and Brian Lynn, who lived two doors down from Moore, agreed with Andrew's description. Moore said that besides coyotes howling and the occasional train going by, before the compressor station started operating, there "really was not any sound out there, hardly." Lynn said that before mid-May 2007, his property had been peaceful and quiet with occasional traffic noise. Gerald Slater, the Gardiners' real estate appraisal expert, described the area as a quiet, peaceful rural neighborhood before the compressor station started operating.

Crosstex's original easement plans required its pipeline to bisect the Gardiners' property, but it ultimately re-routed the easement so that the pipeline only intersected the property's corner. In June 2005, one of Crosstex's agents

_____

[5]Shannon and Andrew had previously lived on JEH Stallion Station's property but moved before the compressor station's construction.

10

noted that Andrew's "main concern" was his property's value because he intended to sell it in the future. In July 2005, Crosstex researched whether there was any existing zoning or other restrictions "around the area of [its] proposed Compressor Station Site off of FM 1385" and found that there were no zoning or planning restrictions in that part of the county.[6] Andrew testified that as of July 2005, he had told Crosstex of his "intended use of the property."

Brad Iles, Crosstex's vice president of corporate development,[7] testified that when Crosstex designed the North Texas Pipeline, it considered where it might place a future compressor station. Iles had no personal involvement in the site selection for the compressor station at issue but had been involved in other compressor station site selection projects and in routing pipelines for Crosstex. He did not know whether there had been any other prospective sites on FM 1385 in July 2005 but was not aware of any other pieces of property that Crosstex had actually purchased on FM 1385 or anywhere else for the compressor station's possible location. Iles said that at that point, Crosstex referred to the station as "proposed" because it did not know how productive the Barnett Shale would be and whether a compressor station was going to be needed.

---

[6]Shannon acknowledged that no zoning restrictions applied to the Gardiners' pasture or the Crosstex property.

[7]Iles testified that he had worked for Crosstex for around eight years, starting as a project engineer on building pipelines, compressor stations, and plants and then moving to manager of engineering, director of engineering, and vice president of business development before attaining his current position.

11

On September 15, 2005, Crosstex bought 19.42 acres on the west side of FM 1385 and north of Mustang Road.[8]  A Crosstex agent met with Andrew on September 20, 2005, and offered him $13,000 per acre for the easement. Andrew told the agent that he had talked with some friends about the pipeline going across his property and "how it would play out in his plans for developing tract," that they had all agreed it would not be the best thing for them, and that money was not the issue.  Andrew told the agent that if he was forced to let the easement go through his property, he would not take anything less than $25,000 per acre.  In November 2005, Andrew initially refused Crosstex's offer of $15,000 plus damages for the easement and told Crosstex that "this corner easement [would] ruin his property," and that they would "just have to battle it out!"

After Crosstex informed Andrew that he could either accept the easement on the southwest corner of his property or it would start eminent domain proceedings, Andrew granted a fifty-foot wide permanent easement—a fifth of an acre—to Crosstex in exchange for $15,000 ($75,000 per acre) and $1,500 for surface damages in January 2006.[9]  The easement from the Gardiners was one

---

[8]Crosstex bought the property from one of Moore's relatives.  Moore said his relative did not know what Crosstex planned to do with the property and that Crosstex told Moore that it was going to use its property for storage.  Moore did not know about the compressor station until after Crosstex acquired an easement from him and "right before they started putting [the station] up."  Iles said that Crosstex could have used the tract as a central location to store pipe and other materials and as a staging area for its contractors.

[9]Andrew said that it had never occurred to him that Crosstex was willing to overpay for the easement rather than have to reroute its pipeline but

of the last that Crosstex acquired. Iles said that he did not think Crosstex should have notified the Gardiners in 2005 or January 2006 during the easement negotiations that a compressor station might be placed across the street someday because Crosstex did not have enough information at that point to do more than hope it would be needed.

The North Texas Pipeline went into service in early 2006. In June 2006, Crosstex acquired a gathering system, which gave it exposure to a larger area of the Barnett Shale. Iles said that at that point, it would not have done any good to tell the Gardiners about the compressor station because Crosstex already had the property on FM 1385 and did not "have the capability of just building this compressor station anywhere [it] want[ed]" because of hydraulic limitations on its location on the pipeline.[10]

Seven individuals, including Crosstex's CEO Barry Davis and then-CFO William Davis,[11] signed off on the expenditure authorization for the compressor station between August 21, 2006, and September 25, 2006. In late 2006,

---

acknowledged that Crosstex paid him in excess of the easement's fair market value.

[10]Iles testified that the compressor station had to be built in the general area where the line started to run out of pressure to push the gas further down the line and that capacity can be added to a pipeline already in service by adding pressure—"the higher the pressure, the more compressed the gas is, the more gas you can move down that pipe."

[11]The Gardiners called Davis, Crosstex's chief operating officer (COO) at the time of the trial, as an adverse witness.

Crosstex started building the compressor station on FM 1385, across the street from the southwest side of the Gardiners' property.

The trial court admitted Plaintiff's Exhibit 14, which showed the August 17, 2006 budgeted total cost of the North Texas Pipeline Expansion Project, which included the FM 1385 compressor station along with another station installation, as $16,100,000. The "base case" return on investment for the project was 17.8% and cash flow of $2.9 million for the first year and the expected case return on investment was 41.2%, and $6.6 million for the first year.[12] The chart showing the nature of the $15,780,900 investment in the compressor station had line-item amounts for, among other things, pipe, valves, fittings, compressors, a generator, motors, electrical equipment, and buildings but no specific line item for noise or sound abatement. Contingencies were listed as "contained within costs above." Davis stated that noise abatement might have been included under "building" but that he did not know because he did not recall anything about the project.

Dean Mueller, Crosstex's director of operations for Texas, stated that every gas compressor station makes noise, caused by the motion of

---

[12]Regarding the projected expenditure for the compressor station in August 2006, Iles said that the expected cash flow under the base case would not have paid for the station's construction and would have been short by $13 million. Under the expected case, Crosstex still would have been short $10 million. Crosstex was not projected to make money on the station in the first years of its operation. However, Iles agreed that if the assumptions in the August 2006 projections came true, Crosstex would have gotten all of its money back in four or five years under the base case and under the expected case, would have had the investment paid off in two or three years. He did not know if the station had been paid off yet.

reciprocating mechanical equipment. To his knowledge, Crosstex had always intended to put a building over the compressors. Mueller became familiar with the compressor station at issue when he was Crosstex's area superintendent and stated that the compressor station was a booster station, used to boost the pressure on the gas so that it could be delivered down a long section of pipe to reach the end users—public utilities and electric generation facilities. He said that it was impossible to transport natural gas in Texas or to have domestic drilling without compressor stations. Iles testified that the North Texas Pipeline could carry substantially more gas with the compressor station in operation— from the original 250 million BTUs per day without it to 375 million BTUs per day with it—but could still operate without it. He also stated that if Crosstex had not expanded the pipeline, gas producers in the area might not have been able to produce as many wells and some of them might have been stranded without a place to take their gas.

## 2. Compressor Station Operations, May 2007–May 2008

The compressor station started operating in May 2007. Plaintiff's Exhibit 18, the compressor station log, shows the dates that the four units came online: Units 2 and 3 came online on May 18, 2007; Unit 1 came online on May 22, 2007; and Unit 4 came online on May 27, 2007.

When it began operating, Andrew described the station as "basically the raw equipment and machinery" without a covering. He described the sound and machinery as follows:

15

[I]t's more of a roar than it is any kind of hum or anything else. It's similar—well, bottom line is what that is is four huge diesel[13] motors the size of—bigger than mobile homes. So if you can imagine four diesel motors that size running, I mean, that's what you've got. I mean, there's—the noise varies considerably. There's times that you close your eyes and think a train was running by a ways off, but, you know, again, it's a constant roar that comes from that station.

Mueller stated that Crosstex began operations with hospital grade mufflers, that mufflers were standard equipment on compressors, and that the mufflers caused Crosstex to "lose a little bit of performance."[14]

Jill McMillan, Crosstex's public relations specialist who became the Gardiners' contact for complaints about the compressor station, visited the area around May 18, 2007, not long after the compressor station began operating two of its engines. She wrote "bad" or "not bad" by addresses in the area and designated most of the addresses "bad." In the notes she later typed up, McMillan described the areas closest to the compressor station site as "NOISE VERY LOUD." McMillan testified that she substituted this for "bad" because she wanted to grab management's attention; she agreed that the noise was louder

---

[13]Mueller testified that the station's engines ran on the pipeline's natural gas, not diesel.

[14]Mueller said that there were several different muffler grades—regular, hospital, and critical or supercritical. Hospital grade mufflers were installed before the compressor station engines started up; Mueller said that he believed that they were called "hospital grade" because that was the kind of noise mitigation "you would expect to have around a hospital setting." In contrast, Crosstex's expert witness Donald Behrens testified that "hospital grade" would be something a particular manufacturer would label a muffler, not a particular model of muffler.

than it should have been and what Crosstex had proposed it to be and that it would need further mitigation. McMillan stated that before Crosstex started noise mitigation, one had to scream to be heard when standing near the street that bordered the station but that she did not think the noise was anything that would obstruct any day-to-day home activities.

On June 8, 2007, Andrew signed a letter to Crosstex, stating that property owners were concerned about the noise pollution and reduction in property values and that Crosstex could resolve these concerns through

> the implementation of a fully enclosed metal building with sound absorbing insulation *and* a twelve (12) foot sound wall around the perimeter of the station.
>
> . . . .
>
> All across the country, companies have constructed *full* metal buildings around these motors, that *include* sound absorbing insulation *as well as* twelve (12) foot tall sound walls around the perimeter to help absorb the noise. A *partial* metal building will not offer the solution that land owners and residence owners are requesting. Additionally, a building without noise reducing insulation will not appease land owners and residence owners alike.
>
> In summary, the only amenable solution at this point is for Crosstex to erect a fully enclosed metal building with sound absorbing insulation and a 12 foot tall sound wall around the perimeter of the substation. Obviously the building would need to be aesthetically pleasing to the eye, with the necessary landscaping.

Andrew testified that he did not write the letter himself but that he signed it and sent it to Crosstex. Shannon signed a separate copy of the same letter; both Andrew and Shannon used the JEH Stallion Station mailing address.

17

On June 19, 2007, Andrew and around thirty to fifty other area landowners went to the "Central Compressor Station Homeowner Meeting" held at a nearby church. Crosstex provided an agenda for that meeting, on which it listed "Central Compressor Station Project Overview," and "Discuss next steps to mitigate concerns." The agenda listed the Crosstex representatives present as its senior vice president of engineering and operations, its vice president of shared services, a public relations specialist (McMillan), a director of operations, a senior engineer, the local plant operator, and a safety specialist.

Mueller said that when Crosstex began receiving complaints from the Gardiners in June 2007 regarding the noise, the station's industrial nature and appearance, and their property values, Crosstex immediately began talking with the Gardiners and hired sound consultants to perform sound surveys and studies to check the noise readings in the area. Mueller explained that Crosstex did not believe that there was a sound issue regarding the Gardiners' property because "[a]t that time and currently that property . . . is pastureland with no residents on that property," and Crosstex did not think there was a sound issue to the livestock that were on the pasture property.

Mueller testified that Crosstex installed "quite a bit of sound mitigation at that station" because it had tried to work with the Gardiners. Mueller said that the compressor building was installed first,[15] then sound-absorbing blankets were

---

[15]The trial court admitted photographs taken on July 24, 2007, that show construction of a barn-like building around the compressor station equipment.

installed inside the compressor building and three sound walls around the coolers (also referred to as fans), an additional sound wall on the east side, and air intake silencers.

Behrens, president of Behrens and Associates, an acoustical consulting firm, and Environmental Noise Control, the division of his firm that did sound control mitigation,[16] testified that Crosstex hired his firm in 2007 to look at the compressor station and make recommendations to control the sound level.[17] Behrens prepared noise impact computer models of the noise levels after the station first started operating. One of the models was of the compressors sitting out in the open with no building and showed a 70-decibel noise level.[18] Another model was the building with sound blanket skirts and showed that a small portion of the Gardiners' property would still experience the 70-decibel sound level. The third model was of a sixteen-foot-high free-standing sound wall thirty feet from the compressor building. Behrens did not have access to the Gardiners' property

---

Mueller testified that the engines were set first and then the building was installed in August because the summer was rainy, despite original plans to have it up and in service in the June/July time frame.

[16]Behrens stated that his firm performed sound measurement, monitoring, and control for industries from oil and gas (80% of their work) to television, motion pictures, industry, municipalities, construction, and special events.

[17]Crosstex also hired Behrens to perform sound testing on the Gardiners' property and to testify.

[18]Behrens said that a 70-decibel level was acceptable for land uses like amusement parks, property adjacent to an interstate, or a transportation hub.

when he made the models and said that his December 2010 sound level measurements were a better indicator of the sound levels on the Gardiners' property than the models.

Behrens testified that his company had built and installed buildings that completely enclose gas compressor stations, including the fans, depending on the client's design. He agreed that those buildings were quieter than the compressor station at issue but were typically more expensive. Behrens agreed that one of the ways Crosstex could have addressed the noise issue at the beginning was by putting a fully enclosed building around the compressor station instead of what it actually built. However, he also testified that he had never recommended to Crosstex to put a fully enclosed building around the compressor station because

> [t]here was a pasture in all directions, all four sides. There were no homes, there were no occupied structures, parks, endangered species, habitats or any of the other motivations that would drive us to recommend doing that kind of sound control in a rural area without people living anywhere near it.

Behrens stated that his company would have made more money if it had recommended a fully enclosed building to Crosstex because it would have been more expensive for Crosstex and more profitable for his company to have built a structure instead of the sound walls.[19] Behrens testified that his sound level

---

[19]Behrens testified that the total amount Crosstex had or would pay him related to the compressor station was around $425,000, including sound mitigation, recordings, and testimony. Behrens acknowledged that over the last five years, he had been paid several million dollars by Crosstex and millions

measurements at the streets in front of the houses in the area "did not warrant the need for sound control because of the low levels of the sound levels."

Mueller acknowledged that the compressor station's metal building did not go all the way to the ground but that the sound blankets inside go all the way to the ground on the east side and the west side and that the secondary eastern wall, installed in November 2011, covered where the building did not go all the way to the ground on the east side. Technicians from Behrens's firm measured the building and custom-fabricated sound barrier/absorber acoustical panels (sound blankets) to close the bottom seven feet of the building on the north, west, and east sides of the structure. Behrens said that the blankets typically take three to five weeks because they are made of a polyvinyl chloride (PVC) shell filled with acoustical batting and a barrier material.

Andrew and Shannon both acknowledged that Crosstex made some changes to the compressor station after the June 19, 2007 meeting but said that the changes did not happen all at once, and they continued to complain about the noise as Crosstex made the changes. Andrew testified that when he took his young son riding, when they got close to FM 1385, his son had trouble with his horse. Andrew said that the third time he tried to tell his son what to do, "it finally clicked" that his son could not hear him, and he found that very frustrating.

more by other gas companies for work on their stations. In 2011, Crosstex represented approximately 5% of his company's revenue.

21

Andrew also said that his cattle and sheep could not hear him honk his horn to announce feeding time.

Copies of the Gardiners' email exchanges with McMillan were admitted as Plaintiff's Exhibits 41 and 43 and Defendant's Exhibit 57. On October 23, 2007, at 2:01 p.m., McMillan sent Andrew an email, stating,

> Thanks for calling earlier regarding the noise abatement at our Central Compressor Station. As communicated earlier, after we finished the noise level survey and determined the appropriate type of noise ab[ate]ment, we're finishing the construction of the building and adding noise abatement material to the building.[20] In addition to that, we're going to construct a 12 ft. sound wall around the fans of the compressor building. We plan to have this complete in the next 3–4 weeks.
>
> Once I receive a picture of what the sound wall will look like, I will forward to you.
>
> I appreciate your patience and want to work with you to address your concerns. Please call me or email me with further questions and I'll send you photos shortly.

On November 8, 2007, at 7:36 p.m., Andrew sent McMillan an email that stated,

> When I spoke with you on October 29, 2007 with concerns relating to the excessive noise coming from the compression station, you informed me that noise reduction measures would be in place by November 19, 2007. Your exact words were three weeks. I see no measures being taken thus far. I will be hiring an attorney to pursue legal action against Crosstex once the November 19th deadline passes if in fact there are no measures in place at that time. As it

---

[20]Shannon testified that when Crosstex first built the metal building around the compressor station, "it seems like they didn't put the [sound-absorbing] blankets" in and seemed to make the noise worse until the sound-absorbing blankets were installed.

seems clear at this juncture, that Crosstex is not interested in minimizing the disturbance at hand.

McMillan replied on November 9, 2007, at 10:29 a.m., stating,

> Thanks for getting in touch with me. We're still on schedule and plan to auger foundations and pour concrete today, let it set over the weekend and begin steel erection on Monday. We've received all of the sound blankets and noise abatement material and will proceed to erect them as soon as the steel is hung. All work will be complete by the end of the week.
>
> Additionally, we're planting trees and shrubs along FM 1385 and the Central Compressor Station to visually enhance the facility. We will begin this process next week at Central and should be done by the end of the week.
>
> As noted in my previous message, we're still on track and will complete everything noted in my previous email.
>
> If you have any further questions, please let me know.

On November 26, 2007, at 10:05 a.m., Andrew sent McMillan an email that stated, "Could you please explain why the wall is not going to be constructed on the side (east) directly across from my property?" McMillan replied the same day, at 12:30 p.m., stating,

> The building wall interior on the east side will be lined with sound absorbent material, as will both the west and north sides of the building. The purpose of the exterior wall on the south side is to abate the noise from the compressor cooler fan which cannot be addressed by lining the building wall. In addition we will begin installation of vegetation tomorrow at the Pilot Point location. It will be installed adjacent to the fence along the east property line.

Andrew responded at 1:57 p.m., stating,

> I understand your e-mail. However, my question is . . . why is there not an exterior wall being built on the east side of the compressor

fans, as there is on the south and west sides of the fans.[21]  The side exposed to my property is the only side not being enclosed.  In other words, there is nothing to abate the sound between my property and the fans.

Behrens testified that the sound blankets, which were installed on the east, north, and west sides of the building, and installed inside the sound walls, cost between $20,000 and $30,000, and changed the overall sound level emanating from the compressor station.  Shannon stated that she did not think the sound-absorbing blankets fixed the problem and that after Crosstex installed the sound walls on three sides, she felt like the noise became louder because there was no wall on the Gardiners' side.

On January 14, 2008, at 10:21 p.m., Shannon sent an email to McMillan, stating,

> This email comes out of pure frustration.  I am working late tonight and cannot even concentrate due to the noise and vibrations that I am hearing and feeling in my office from the Crosstex Compression station on F.M. 1385.  My office is directly east of the substation (approximately 1 mile east).  As things currently stand at the Crosstex substation, the walls that have been erected on the North, South [sic] and West sides have effectively funneled 100% of the noise in an easterly direction.  Tonight it sounds as if a helicopter is hovering. . . .  We have waited patiently for results to reduce the noise and apparently, Crosstex is not willing to work with us.  I have spoken with an attorney who specializes in this area.  We have been advised of the statute of limitations and stand ready to proceed.  We do not desire a lawsuit, but if that is the only way to preserve and pursue this issue, then you leave us no choice.

---

[21]Behrens's firm added 310 lineal feet of 30-foot high sound wall on the west and south sides of the compressor fans for $194,000 on November 30, 2007.

Shannon said that by sending the email, she was trying to get McMillan's attention and that what they wanted was for the noise to go away. Shannon agreed that she was not acting on behalf of JEH Stallion Station when she sent the email and that JEH Stallion Station had not brought a claim against Crosstex for interfering with the company's operations.

At some point after Shannon's January 14, 2008 email, Behrens's firm built the sound wall on the east side of the compressor station's fans for $67,000.[22] Shannon stated that the installation of the east side sound wall did not reduce or did little to reduce the noise or vibrations, while Behrens stated that in his opinion, it was effective in reducing the sound from the cooler fans.

Mueller testified that the cooling fans protrude from the building to provide cooling for the engines. The sound walls were staggered on the south side to facilitate air flow in summer, when the prevailing wind came out of the south. Mueller said that the engines could not operate without adequate air flow, which was why Crosstex was hesitant about enclosing its fans with sound walls. Mueller explained that the east wall was installed after the south, west, and north walls because, due to the sound mitigation readings, Crosstex did not believe there was a major issue there regarding the side facing the pasture and because of its concerns about completely enclosing the cooler fans. Mueller said that

---

[22]Andrew testified that a wall was eventually built on the east side "[s]ome months later" and only after his complaint. Andrew testified that he complained over ten times to Crosstex about the noise since the station began operating in May 2007.

Crosstex had experienced some operational issues at the station because of the sound walls around the compressor fans but that it had installed mitigation on the east side of the station because it wanted to satisfy the Gardiners and avoid litigation.

On March 8, 2008, Shannon sent McMillan an email with an attached demand letter from Andrew that stated, in pertinent part, "This letter comes to you in regards to the Crosstex Compression Station located directly across from my property on F.M. 1385. As we have discussed on numerous occasions, the noise being emitted by the station remains to be a constant deafening noise." Andrew informed McMillan that he had consulted an attorney and a valuation expert and was seeking damages for the difference between the fair market value he estimated for the property before the compressor facility was built ($2,372,500) and after ($711,750). On March 31, 2008, Andrew and Shannon's law firm sent Crosstex a letter to inform it that the Gardiners had received Crosstex's March 19, 2008 letter and that the Gardiners "do not believe that the additional construction on the compressor station referenced in your letter will ameliorate the damages Crosstex has caused to their property." Andrew and Shannon filed suit against Crosstex on May 5, 2008.

### 3. After the Gardiners Filed Suit

#### a. December 2010

Behrens testified that he conducted sound testing at the Gardiners' property in December 2010 and that his sound readings were consistent with the sound readings taken by the Gardiners' expert, who did not testify and whose report was not offered into evidence. The compressor station was operating at the time Behrens took his readings—he went into the compressor building and saw three of the four compressors running. He used three state-of-the-art meters for the testing after calibrating them prior to deployment: Meter 1 was placed just inside the Gardiners' property, adjacent to the compressor station; Meter 2 was placed approximately 1,200 feet from the compressor station; and Meter 3 was placed near Mustang Road on the property's south end. Meter 2 was in the grazing path of some animals that munched through the power cable midway through the survey, but the other two meters recorded continuously from Friday to Monday. The meters digitally recorded the sounds in .wav files. Behrens said that to him, the compressor station was audible at Meter 1's location, inaudible at Meter 2's location "except for a very faint tonal change," and completely inaudible at Meter 3's location.

Behrens testified that after the testing, he retrieved the sound meters, downloaded their information, saved the files, and then listened to them to identify any "bumps" in the recordings—such as a car driving by or aircraft overflight—to identify sources before preparing his report. Behrens said that the

27

compressor station represented a constant minimum sound level because it would have to be shut off for that level to drop and that the engines ran at "an extraordinarily stead[y] RPM and steady noise level."

The trial court admitted the data recordings of Meters 1, 2, and 3. Behrens played for the jury samples from Meter 1 that were taken at 4:45 p.m. on December 10, 2010; 1:07 a.m. on December 11, 2010; and 9:19 a.m. on December 12, 2010, and described the peak sound level as 60 decibels.[23] Behrens stated that he measured a sound level above 63 on the Gardiners' property when vehicles drove past and that traffic noise affected both sides of the Gardiners' property. Behrens's report states that as to Meter 1, the predicted unmitigated level was 69 dBA, the predicted mitigated level was 60 dBA, and the measured mitigated level was 60–63 dBA.

Behrens played samples from Meter 2 taken on December 10 at 1:40 p.m., on December 11 at 2:10 a.m., and on December 11 at 7:47 a.m. Behrens's report for Meter 2 states that the predicted unmitigated level was 56 dBA, the predicted mitigated level was 49 dBA, and the measured mitigated level was 44–

---

[23]Behrens testified that noise has a logarithmic increase: from 40 decibels to 60 would result in the levels at 60 being four times as loud as the levels at 40. Behrens also testified that wind and humidity can increase noise and that when he took his sound readings on the Gardiners' property, the wind was blowing from the northwest to the southeast, resulting in sound levels higher than if he had instead measured to the northeast of the site.

28

46 dBA.[24]  Behrens played samples from Meter 3 taken at 4:35 p.m. on December 10, and 3:30 a.m. on December 11.  Behrens's report for Meter 3 states that the predicted unmitigated level was 56 dBA, the predicted mitigated level was 46 dBA, and the measured mitigated level was 46–48 dBA.

Behrens testified that he was familiar with the American National Standards Institute (ANSI) standards and recommended acceptability criteria for land use, sound levels, and background sounds that experts in the field of acoustics, including the Acoustical Society of America, considered to be reliable authority.  Behrens said that the ANSI standard suggested for livestock farming, animal breeding, and ranching day-night sound level equivalent would be up to 65 decibels and marginally compatible up to 75 decibels.  For quiet rural residential areas, the maximum was 45 decibels.  Behrens stated that this maximum would not apply to quiet rural residential areas near busy roads, that the Gardiners' property did not have any residences on it, and that the property had a busy road nearby.

Behrens testified that the readings that he took that were adjacent to the compressor station at the fence line (Meter 1) fell within the "marginally compatible" classification for livestock farming and that less than 100 feet from the fence line would fall within the "compatible" classification.  The readings he

---

[24]For comparative purposes, Behrens testified that the decibel level in the courtroom without playing the audio was "running about 45 decibels," and when he spoke, "goes upwards of 50, 57, 60."

took from Meter 2 were compatible with ANSI standards for residential urban, suburban, single-family, or extensive outdoor use; the ANSI level for residential was 55 decibels. Behrens stated that every time the distance doubles, the sound level is reduced by six decibels, so he estimated that at 600 feet away (halfway between Meter 1 and Meter 2), the sound level would be between 50 and 52 decibels.

Behrens stated that based on all of the readings that he had taken in rural areas of North Texas, sound levels could vary from the high 30s to the high 40s. He opined that the readings he took at Meter 2 and Meter 3 were typical of what the sound levels were like in most rural areas in North Texas and that the types of sound levels he recorded on the Gardiner tract were acceptable and reasonable for agricultural tracts and compatible with livestock use. Behrens also stated that the majority of the property was still compatible for residential use.

### b. August 2011

The trial court admitted a video recording of the station during Andrew's testimony and allowed it to be played to the jury over Crosstex's objections. The video recording was taken in August 2011 from Andrew's pasture at varying distances from the compressor station and at varying times. The compressor station is clearly audible, as are vehicles driving on FM 1385 between the compressor station and the pasture. Crosstex asked that the record reflect the

volume level at which the exhibit was being played; the computer volume at trial was set at 90%.[25]

Andrew witnessed Casey Gooden make the recording but did not know Gooden's qualifications, and neither he nor Gooden took any decibel readings when Gooden made the video. Andrew admitted that he had never heard the term "volume distortion" and that he did not know whether the video camera used to make the recording had features that would create volume distortion.

---

[25]Behrens brought his own equipment to play the audio recordings and stated that the recordings could not be played with any accuracy regarding the volume level at which they were recorded just by putting them in the computer and playing them with the volume on 90%. Behrens also testified that with regard to accurately recording sound, the gain control setting can either amplify or quiet the sound that is recorded,

> [a]nd so one of the things that you have—the biggest issue, of course, is playback because it's the same thing, you can turn volume up or down on the playback. So the two concerns are, what kind of sound is recorded when you do the video with the gain setting on the audio feature? And then, of course, during playback, what is the volume of the playback?
>
> For example, I can make a pin drop hurt your eardrums by adjusting both the gain during the video and the volume during the playback. So you need to have controls, if you want to represent the sound level that existed when you did the recording.

Behrens described the need for a calibration point to determine how loud the sound was when the information was collected and at what volume to play it back for equal representation of what was recorded, and for speakers with the full range of octave, i.e., the ability to play lower frequency sound.

### c. September 2011

Crosstex installed air intake silencers around September 2011[26] to "baffle[]" that air as it travels through the intake piping into the combustion engine." Mueller said that Crosstex had added the intake silencers because, as it had from the beginning, it had tried to work with the Gardiners.

Behrens played a sound recording made from the shoulder of Mustang Road west of the Gardiners' tract, in the roadway by the driveway of the first house, at 12:37 p.m. on September 28, 2011. The recording contained a car going by with dogs barking in the background, and Behrens said that he could not hear the compressor station when he took that recording. He also played a sample recorded from Cotton Trail at 11:37 a.m. on September 28, 2011, which started off at 37 decibels—lower than the volume of the courtroom.

### d. November 2011

Behrens's firm installed a fifteen-foot sound wall along the property line on the east side of the building, in November 2011, for $107,000, which he said further reduced sound from the station.[27]

---

[26]While Behrens testified that Crosstex had installed the air intake silencers before his December 2010 readings, Mueller said that he thought the air intake silencers were installed in September 2011, and Crosstex's receipt for the intake silencers is dated September 2, 2011. Crosstex was invoiced $41,048.40 for the silencers and other materials needed to make them work, with an expediting charge for four-week delivery and a freight charge to follow.

[27]Plaintiff's Exhibit 191 shows that on November 4, 2011, Behrens's firm submitted its cost proposal for providing "approximately 122 lineal feet of 12 or 15 foot high Permanent Sound Wall at [the] Central Compressor Station," with an

### e. January 2012

The trial began in January 2012. Andrew said that the compressor station's droning and constant roar made it hard to relax but that it was worse in some parts of his property than others.[28] He further testified that the noise substantially and unreasonably interfered with his enjoyment of the property and had since Crosstex began operating the station and that it interfered with his development plans for the property because no one would buy a house on a lot that "has a constant 24-hour-a-day roar." However, Andrew also stated that when the noise complaints began, Crosstex began additional work on the compressor station and was still doing more work six weeks before trial. Andrew stated that although Crosstex had put in sound abatement material, constructed more than one wall in front of the station, and taken lots of steps to mitigate the noise, nothing Crosstex did changed the sound situation.[29]

Andrew also acknowledged that, as his June 8, 2007 letter requested, Crosstex had built a building around the station with sound-absorbing materials

---

estimated lead time of one week and an estimated time to complete the installation of three to five days.

[28]Directing the jury's attention to the photograph of his property, Andrew stated, "I mean, yes, I'm not going to argue, it is bearable back here as far as being out and about and possibly living out in here, but I mean, again, even here, it's an irritant to me."

[29]During cross-examination, Andrew said that the mitigation had "probably reduced [the noise], obviously, some, but nowhere close to what [he] would consider okay. And that's what this whole issue is about."

and sound walls and planted shrubs and trees between the station and his property. When the first trees died, Crosstex replanted. During cross-examination, Andrew agreed that his complaint was not that Crosstex did not do the things he asked for but rather that those things had not worked to reduce the noise to a level he found acceptable. He stated that he did not believe that Crosstex had ever consciously disregarded his complaints.

Shannon stated that she had gone to their property the night before her testimony and heard the compressor station roaring and that the noise had not significantly improved since she sent her January 14, 2008 email to McMillan almost four years before. Shannon said that Crosstex's mitigation efforts had not solved the noise problem because she could "still hear it really loudly and [feel] the vibrations" and if the mitigation efforts helped, "it was very little."

Andrew stated that he was not an expert on how to deal with the sound issue at the compressor station. Andrew agreed that he had no idea what else Crosstex could do to mitigate the noise but that he assumed that there was technology "out there to fix it. It hasn't been done."

Shannon also said that she was not an expert on noise abatement and did not know what else Crosstex could do to mitigate the noise. But she additionally testified that an electricity company had come in and asked the area property owners what they thought of its proposed plans to install power lines in the area, in contrast to Crosstex, which had not asked for anyone's thoughts with regard to its compressor station's location or the noise it would generate. Shannon

34

suggested that Crosstex should have bought enough land that the noise affected only Crosstex's property and not neighboring landowners.

Portions of Mark Jordan's deposition testimony, which were read to the jury, reflected that he supervised Crosstex's acquisition of pipeline rights-of-way and sites associated with natural gas gathering, transportation, compression, and other land responsibilities. Jordan stated that Crosstex's current process prior to locating a compressor station on a particular property is to hire an acoustical engineer to perform a noise study but that he did not know whether that was the case when the compressor station at issue was sited.

Andrew testified that Behrens's testimony and recordings did not accurately depict the noise that the compressor station makes on his property. Specifically, Andrew told the jury,

> Now, I came in here and I have been truthful with what I hear on my property. I'm not going to argue—I don't know enough about decibel readings to tell you what you heard yesterday was or wasn't correct as far as decibels. But I am fully aware of what the sound levels are to the human ear on my property. What y'all heard yesterday was not accurate by the furthest stretch of an imagination.

Andrew said that he drove out to the property from 11 p.m. to midnight on January 12, 2012, to all of the points discussed by Behrens in his testimony, "and at no point was that gas substation inaudible." Andrew said that from where Meter 2 had been located, the compressor station sounded like a train. He stated, "When Mr. Behrens sat here in this chair under oath and looked at every one of you and said that it was inaudible at Location 2, that was not true."

35

### 4. Additional Site Selection Testimony

Iles testified that a factor that goes into Crosstex's route selection and compressor station site selection is the impact on number of homes "but you can't just completely avoid those things." Iles said that the compressor station at issue was in an appropriate location because "there's actually quite a bit of open land around it," most of it open pasture, it had good road access needed by Crosstex's operation staff, and it was located generally halfway on the pipeline. Mueller testified that he had been to the compressor station several times, including within the last month. He said he had noticed traffic on FM 1385 while there, counting over eighty vehicles between noon and 2 p.m., and described the area around the compressor station as remote and far outside of the city limits, with plenty of agricultural and nonresidential uses and places of business, including a flea market, a travel trailer park, a large horse breeding facility, and welding shops.

### 5. Other Noise Evidence

Moore testified that after the compressor station started operating, he could hear it on his entire 100 acre-property and in his home. Moore stated that when the station first began operating, it woke him early in the morning; although it no longer did so, "it's still just as loud." He further testified that it seemed loudest in the morning and was so loud that "you can't do anything out there without being bothered by it." Moore went to the June 19, 2007 meeting but did not otherwise become involved in the noise complaints. He had been to the

Gardiners' property a few times, most recently a week before trial, and could hear the station from their property; it was loud. Moore stated that Crosstex's efforts at mitigation "just haven't helped the sound much," and that if they had helped, "it's very little" and had not solved the noise problem.

Lynn's home was the closest home to the station. He described the noise after the station began operating as very loud, constant, and like "an engine of a locomotive sitting on [his] driveway practically." Lynn attended the June 19, 2007 meeting and said that the Crosstex representatives told the crowd that "they would get it back to as close as it was before as possible to them in the hope that it would be satisfactory to everybody." Lynn stated that Crosstex did not make things right, that the noise level was not acceptable to him, and that he could no longer use his backyard to entertain because of the noise. Lynn stated that he had visited the Gardiners' property, that the compressor station was very loud there, and that he had felt vibrations on his property from the compressor station.

Lynn said that he had not tried to sell his property and move because his family was in the area. He thought Crosstex's mitigation efforts—putting in the building, sound-absorbing blankets, and sound walls—had reduced the station's noise and said with regard to noise mitigation, "To my knowledge, I don't know what else [Crosstex] could do." In his deposition, Lynn stated, "I honestly think that they've done the best that they can do at this time," but during trial, he said that he thought Crosstex could do more now than he did at his deposition the year before.

37

Scott Norris, a property developer, testified that he had gone out to the Gardiners' property on the morning of his testimony and that the noise level was loud, comparable "to a locomotive engine on a train as consistent humming, vibration, loud noise." He stated that on a previous visit, he had pulled over to the side of the road near the compressor station, put a water bottle on top of the fence post, and could see the vibrations in the water. On the morning that he testified, he brought a clear glass and water, set it in the property's interior on a gate, and saw vibrations.[30]

Norris opined that the Gardiners' property had been well-suited for residential development before the station began operating but that afterwards, no developer would buy the property for residential development because the nearby noise and vibrations made it less competitive. Norris stated that there were different expectations of noise based on location—rural or urban—and that the noise level on the Gardiners' property was very loud for a rural area but might be acceptable in urban areas like Frisco or Plano. Norris said that the sound levels were not acceptable for one-acre residential development in a non-urban setting. He acknowledged that, given the growth pattern from Dallas, the

---

[30]Behrens testified that vibrations could be airborne or ground-borne but that the compressor station produced very little vibration because the machinery had to be balanced or the system would fall apart. Behrens did not believe that it would be possible for the ground to vibrate several hundred feet away from the compressor station because ground vibrations attenuate very quickly. He said that a glass of water in the middle of the Gardiners' property could shake from wind or livestock but not from the compressor station.

Gardiners' property would someday be urban and that FM 1385 was projected to become a six-lane divided highway but said that it would be more like a parkway with signal lights instead of unimpeded high-speed traffic.

Slater visited the Gardiners' property six to eight times after the compressor station started operating, the most recent visit being the day before his testimony, and stated that he could hear the station every time he went and that the day before his testimony, "it was louder than [he has] ever heard it." Slater described the sound as "rumbling like a locomotive-type engine or diesel engine," followed by a shrill sound "like the sound of an air impact wrench that takes off lug bolts."[31]

Jacki Scott, who built a home in the area after the station began operating, testified that the sound level at FM 1385 and Mustang Road was extremely loud and sounded like a jet engine with a high-pitched noise. Scott testified that she became aware that the compressor station was operating because of the noise, which she heard when feeding her cattle and improving her property. Scott described the noise when the station first started operating as similar to "standing in the middle of an airport with jet airplanes taking off all around me." Scott testified that she did not think the sound level had changed over time, that it was still extremely loud, and that she had to raise her voice to hold a conversation

---

[31]Mueller said that the "air wrench" sound that Slater described was caused by preventive maintenance on the facility, performed once a quarter for two to four hours.

outside of the house. Scott stated that none of the sound mitigation efforts had changed what she heard at her house or on her property and that she believed it had had no effect.

Scott stated that when Carl Watts from Crosstex showed up uninvited on her property, she complained to him about the noise, and Watts told her that "the building really needed to be fully enclosed, but that would cost . . . a lot of money and Crosstex didn't have the money and that he wouldn't want to live by it either."[32] Scott said that she built her house despite the compressor station because she was too fully invested in the land, thought Crosstex "was going to work with [her] to mitigate it," and knew if she tried to sell, she would not get a good price.[33] Scott said she could hear traffic from FM 1385 at her house.

Mark Latham testified that around 2006 or 2007, he had negotiated with a real estate broker who represented Moore for the sale of Moore's property immediately west of the Gardiners' property and south of the compressor station based on rumors about a 15,000-acre entertainment complex being developed in the area. Latham's company had been interested in buying that property and around fifty other nearby tracts, and he saw the compressor station but it did not affect the amount his company had contracted to pay Moore. He did not recall

[32]Scott also described McMillan as condescending and said that McMillan had downplayed her complaints.

[33]Scott never talked to a realtor or real estate broker about how much her property might sell for and did not have her property appraised after the compressor station started operating.

40

hearing anything loud from the compressor station, but his company ultimately terminated the contracts in March 2007 because their information about the development was incorrect or misguided. Latham testified that he had been in the area since the compressor station had been operating and did not hear anything unreasonably loud in his estimation but agreed that after the station had started operating, he just drove by with his windows up.

Iles said that he went to the compressor station on the day before his testimony, visited the operator, and made some phone calls while he was there because Crosstex used the building next to the compressor station as an office. Iles said that while he could hear the compressor station, it was fairly quiet in the office and that he made a cell phone call from the property's entrance gate and was able to converse without raising his voice. Iles said he had more trouble talking over passing traffic than the station's noise.

Mueller testified that the station's four engine compressor units were inside the compressor building and that Crosstex employees were required to wear ear protection when inside the compressor building because the noise was very loud. The engines' cooling fans were located behind sound walls. The two nearby buildings were a "storage/shop" building and a field office building. Both were portable metal buildings. Mueller said that Crosstex did not run all four engines all of the time and in 2011, for the majority of the year, it ran three units. The number of units running and the speed at which they run is determined by the supply of gas on the pipeline. Mueller said that the supply of gas was steady

41

throughout the year, with short peaks in summer and winter. The lowest speed the compressor engines could run was 800 RPMs and the highest was 1,000. When the pressure increases, the RPMs speed up; the engines' RPMs are electronically controlled.

Mueller said that, in his opinion and experience, there was no noticeable difference in sound level between running three engines and four, or in the station's sound when running at 800 RPMs or 1,000 RPMs. Crosstex's remote monitoring facility—Supervisory Controls and Data Acquisition (SCADA)—notifies Crosstex when an engine goes down, and SCADA had notified employees several times when one of the engines had gone down because the employees could not physically hear the difference.

Mueller said that while it was very loud inside the compressor building, in his opinion it was not loud outside the building even before they added the secondary east wall. Mueller opined that passing traffic was louder than the station and that the station's noise was quieter after the sound walls were installed. Mueller testified that on his last trip out to the station, he drove out to Mustang Road near where Moore lived, parked his truck, got out, sat down, specifically listened for any noise from the station, and could not hear anything.

Mueller said that the office building by the compressor station was used by operations staff to record information on Crosstex's daily log reports, make phone calls, and—after long days—sleep. Mueller said that mechanics who had been at the station late at night to work on equipment had slept on the office's

42

couch, as had workers kept out there twenty-four hours a day during winter freezes. The trial court admitted photographs of the office's interior, showing the couch with a deer's head mounted on the wall above it and a clock and message board hanging on nearby walls.

Mueller said that he had never felt any vibrations working in the office or seen anything fall from the walls. He had attended several meetings at the office, and the station's sound had never interfered with the meetings or with phone calls, although the engines could be heard inside the office building. Mueller further testified that Crosstex had vibration switches installed in the facility to monitor vibrations to make sure that the equipment stayed in alignment and that the station's vibration monitors had not indicated any recent vibrations.

Mueller said that he assumed Crosstex knew the station would make some noise before it started operations in May 2007 but not to what extent because it was a normal operating compressor station, just "[l]ike [Crosstex's] Cooper Station that ran for almost a year before any complaints." Mueller said that not all of the sound mitigation efforts were made solely for the Gardiners' benefit but that the secondary east wall was installed to try to satisfy the Gardiners. Mueller said, "To my knowledge, Crosstex had been working with the Gardiners from the beginning trying to satisfy them and different methods and nothing we suggested to do were they satisfied with." He acknowledged that he had never spoken with the Gardiners and that he did not decide when the last wall was installed.

James Hogg, a real estate appraiser, testified that he did a site inspection on December 15, 2010, and that he could hear sound from the compressor station at some parts of the property but did not consider it loud. Hogg said that it did not interfere with his conversation on the property and that he did not believe the sound from the compressor station had any negative impact on the property's fair market value.

## 6. Conclusion

Crosstex complains that the Gardiners failed to offer a scintilla of evidence that it committed any act of negligence in creating and operating the compressor station, that they failed to show the standard of care that a natural gas pipeline and compressor station operator of ordinary prudence would have exercised under the same or similar circumstances, or that Crosstex's conduct fell below any such standard. Crosstex also argues that the contrary evidence conclusively proves that Crosstex acted with ordinary prudence and was not negligent and that the station did not substantially interfere with the Gardiners' actual use of their property as grazing land.

The Gardiners respond that the evidence showed that Crosstex could have located the station elsewhere on the pipeline, that it built the station knowing that it was going to be noisy but without initially taking any mitigation measures, that it could have installed a building that wholly enclosed the station but did not do so because it would be more expensive, and that its efforts at mitigation were not effective at reducing or eliminating the noise. Crosstex replies that the Gardiners

44

identified no evidence showing that Crosstex negligently created a nuisance under the standard submitted to the jury.

Anything more than a scintilla of evidence is legally sufficient to support a finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

Based on the evidence set out above, the jury could have found that the Gardiners were persons of ordinary sensibilities experiencing substantial interference with their use and enjoyment of their pasture because of unreasonable discomfort or annoyance caused by the sound of the compressor station and that during the four years since the compressor station had started operating, Crosstex had failed to use ordinary care, failed to do that which a person or party of ordinary prudence would have done under the same or similar circumstances, or did that which a person or party of ordinary prudence would not have done under the same or similar circumstances.[34] Therefore, we conclude that the evidence is legally sufficient and overrule this portion of

---

[34]That is, the record reflects that there was no specific line item budgeted for sound mitigation when the station was approved but Mueller said that all compressor stations are noisy.

Crosstex's first issue. However, we sustain the factual sufficiency portion of Crosstex's first issue.

An opinion reversing for factual insufficiency must detail the evidence relevant to the issue in consideration and clearly state why the finding is factually insufficient. *Pool*, 715 S.W.2d at 635. The record reflects that Crosstex built its compressor station at a location on its pipeline where it appeared to affect the fewest people—in an unzoned, rural area across the street from a pasture instead of a home—and that the station had to be located on the pipeline, which was already in place by the time Crosstex decided to build the station. *Cf. Heritage on the San Gabriel Homeowners Ass'n v. Tex. Comm'n on Envtl. Quality*, 393 S.W.3d 417, 437 (Tex. App.—Austin 2012, pet. denied) (op. on reh'g) (discussing factors that permit-amendment applicants for proposed landfill expansions have to provide to TCEQ, such as zoning at the site and vicinity, character of the surrounding land uses, growth trends of the nearest community, and proximity to residences and other uses); 65 Am. Jur. 2d *Railroads* § 112 (2014) (stating, with regard to site selection of railroad facilities, that "[n]egligence in the improper selection of the site or the improper maintenance and operation of structures and appurtenances incidental to the operation of the road may render a particular yard, enginehouse, shop, or other appurtenance a nuisance as to property injuriously affected thereby"). Although Jordan testified that Crosstex's current process prior to locating a compressor station is to hire an acoustical engineer to perform a noise study, he did not know if that had

46

occurred when the station at issue was sited, and no one testified that this was the applicable standard of care for locating a compressor station when Crosstex selected the site. *Cf. Holubec v. Brandenberger*, 111 S.W.3d 32, 34–35, 39 (Tex. 2003) (reversing jury's verdict for plaintiff on negligent nuisance when charge failed to include right-to-farm limitations defense).[35] Crosstex's evidence also showed on a numerical basis that the post-mitigation noise levels and most of the pre-mitigation noise levels were not incompatible with the Gardiners' actual use of the property.

Contrary to the Gardiners' argument that Crosstex built the station without initially taking any mitigation measures, Crosstex's budget for the station showed "buildings," and Mueller stated that before start-up, hospital-grade mufflers were installed on the compressors and that, to his knowledge, Crosstex had always intended to put a building over the compressors.

When Crosstex received complaints that the compressor station's noise was too loud for the area, it held a meeting with the area landowners, consulted

---

[35]On retrial, a second jury found that the Holubecs' feedlot was a nuisance and that the Holubecs were negligent in their location, construction, or operation of the feedlot; the Holubecs did not appeal those findings. *Holubec v. Brandenberger*, 214 S.W.3d 650, 653–55, 657 (Tex. App.—Austin 2006, no pet.) (noting that the plaintiffs complained of foul odors, swarms of flies, dust, noise, and light emanating from the defendants' ten-acre sheep feedlot, which contained as many as 5,800 sheep at various times, 135 feet from the plaintiffs' home). However, the court concluded that the trial court's permanent injunction against operating the feedlot within 1,000 feet of the boundary between the parties' properties was overbroad when the plaintiffs stated that moving the feedlot to an alternate location on the defendants' 450-acre ranch within 1,000 feet of the boundary would cause little or no harm. *Id.* at 653, 658–59.

with a sound expert, and began implementing mitigation efforts based on his recommendations. Andrew's form letter asked for a fully enclosed metal building with sound installation, twelve-foot sound walls around the perimeter, and landscaping, and warned Crosstex that a partial metal building would not suffice, but Andrew admitted that he did not write the letter and that he was not an expert in dealing with sound issues. Crosstex's expert did not recommend to Crosstex that it put a fully enclosed building around the station, even though he could have earned more money by doing so, because he did not think that the area warranted it. Scott's testimony does not indicate when Watts told her that the building needed to be fully enclosed or what his qualifications were to make that statement. Crosstex installed sound walls around the fans instead of the perimeter, but there was no testimony that this decision was negligent and that such walls around the perimeter instead of around the fans would have made a difference in mitigating the noise. There was no testimony that the compressor station itself was operated negligently or that the mitigation itself—mufflers, building, sound blankets, sound walls, and air intake silencers—had been negligently installed.

Although Andrew testified that he assumed that there was additional sound mitigation technology "out there to fix it," the only party who testified about the technology available to mitigate sound was Crosstex's expert. The record reflects that Crosstex relied on its expert's recommendations, and nothing shows that such reliance was negligent under the circumstances. Further, no one

48

testified about how long such mitigation efforts would normally take or whether Crosstex's efforts took too long, whether any technologies other than a fully enclosed building existed to reduce the noise, and whether a fully enclosed building would have been quieter by the time Crosstex had installed other mitigation measures. The record reflects that Crosstex continued to invest in additional sound mitigation to try to remedy the problem despite the Gardiners' complaints that none of its efforts made a difference.[36] We conclude that the evidence is factually insufficient to support the jury's negligent nuisance finding, and we sustain this portion of Crosstex's first issue.

## D. Trial Amendment

In their appellees' brief, the Gardiners argue that the trial court abused its discretion by denying their request for a trial amendment so that they could add the "abnormal and out of place" basis for nuisance to the jury charge, and they ask that we find that they are entitled to a new trial on that claim if we reverse due to inadequate evidence of a negligent nuisance.

A trial court abuses its discretion if it acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its

---

[36]As pointed out by Crosstex, in their closing argument, the Gardiners did not highlight any particular acts of negligence by Crosstex but instead asked that if the jury did not find that an intentional nuisance had been created but felt that Crosstex was negligent, to "answer yes to No. 2."

discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

Under rule of civil procedure 66, the trial court may allow pleadings to be amended and shall do so freely when presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the allowance of such amendment would prejudice him in maintaining his action or defense upon the merits. Tex. R. Civ. P. 66; *see also* Tex. R. Civ. P. 63. Under the rules of civil procedure, the trial court has no discretion to refuse an amendment unless (1) the opposing party presents evidence of surprise or prejudice, or (2) the amendment asserts a new cause of action or defense and thus is prejudicial on its face, and the opposing party objects to the amendment. *Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex. 1990). The burden of showing prejudice or surprise rests on the party resisting the amendment. *Id. But see Chapin & Chapin, Inc. v. Tex. Sand & Gravel Co.*, 844 S.W.2d 664, 665 (Tex. 1992) (op. on reh'g) (stating that the nature of the amendment affects the abuse-of-discretion analysis and distinguishing between formal, procedural amendments that conform the pleadings to the evidence and substantive amendments that change the nature of the trial).

The trial began January 9, 2012, and the Gardiners requested the trial amendment four days later during the charge conference. On January 13, the Gardiners argued that because the supreme court in *Likes* had discussed the

three classifications of actionable nuisance and because the evidence supported all three classifications, they should be allowed a trial amendment. The trial court responded,

> I have no doubt that the law recognizes those three authorities clearly, distinguish[es] those three manners of private nuisance. *I also have no doubt that the evidence in this case supports the submission of all three of them*, but I find the pleading to be wholly void of any reference, even vaguely, to defendant's conduct being abnormal and out of place in its surroundings such as to create a nuisance. And it's my view that the precedent requires at least some manner of placing the defendant on notice of the manner of plaintiffs' claims. [Emphasis added.]

When the Gardiners requested the trial amendment based on trial by consent, Crosstex objected, stating that the issue had not been tried by consent and arguing that "[i]t would be wholly impossible to try to sever out any evidence in such a manner as they're suggesting, and we would be unfairly surprised by a trial amendment at this point at the close of the evidence." The trial court denied the Gardiners' requested trial amendment.

An amendment is prejudicial on its face if it asserts a new substantive matter that reshapes the nature of the trial itself, the opposing party could not have anticipated the amendment in light of the prior development of the case, and the opposing party's presentation of the case would be detrimentally affected. *Dunnagan v. Watson*, 204 S.W.3d 30, 38 (Tex. App.—Fort Worth 2006, pet. denied). However, here, the entire case was based on the Gardiners' underlying grievance that the compressor station's noise was abnormal and out-of-place in its surroundings.

51

In part of their opening statement, the Gardiners told the jury that the case was a nuisance and negligence case involving the impact of a gas compressor station—"a very heavy industrial use"—located directly across from their property. Throughout the Gardiners' case, they presented evidence that regardless of Crosstex's efforts at mitigation, the noise produced by the station remained too loud for their previously quiet, rural neighborhood. And in their closing argument, the Gardiners argued that the case began with a request to Crosstex "to, basically, fix the problem that they created from the noise from the compressor station" and that after numerous requests and "some Band-Aids that were put up," the problem was never fixed. The Gardiners reminded the jury that the only testimony "as to the quietness and rural feel before the gas compressor station" was from their witnesses. The Gardiners argued that running the compressor station without a building around it created an intentional nuisance, that all of the area landowners who testified agreed that it was not the perfect place for a gas compressor station, and that the noise was unreasonable and unacceptable when operations started and was still unreasonable and unacceptable at the time of trial.[37] In their rebuttal argument, the Gardiners stated that the sound was loud and constant.

---

[37]The Gardiners also argued that Crosstex was greedy because it could have shut off the compressor station when it heard the noise complaints as gas would still flow through the pipeline, just not as much, and because Crosstex could have paid for a fully enclosed building but did not want to because of the cost. They further argued that all of Crosstex's witnesses were biased.

Crosstex's theory of the case was that the station was not too loud and never had been and that it provided mitigation above and beyond what was necessary to appease the Gardiners. In its opening statement, Crosstex stated that the nuisance case was about (1) whether the gas compressor station constituted a nuisance that substantially interfered with the Gardiners' use and enjoyment of ninety-five acres of undeveloped land in a rural, unzoned, unincorporated part of the county, which they had never used for anything other than running cattle and where there were other commercial and industrial uses in the area and nearby traffic noise, and (2) whether the station had caused the property to diminish in value by over $2.5 million. Crosstex told the jury that the evidence would show that the station could not be in a better place than across the street from vacant cattle land and that Crosstex had taken substantial, reasonable steps "to help mitigate any sound that may be affecting the Gardiners' property."

In its closing argument, Crosstex argued that the station was not a nuisance, that the pipeline had to be routed from the wells' location, and that without the ability to transport more gas on the pipeline, producers and royalty owners would not be able to get their gas out, so turning off the compressor station was not as viable an option as shutting down a noisy motocross track.[38] It

---

[38] *See, e.g.*, *McAfee MX v. Foster*, No. 02-07-00080-CV, 2008 WL 344575, at *1 (Tex. App.—Fort Worth Feb. 7, 2008, pet. denied) (mem. op.), *cert. denied*, 555 U.S. 1102 (2009).

also argued that its witnesses were more credible than the Gardiners' witnesses, that the evidence showed that the noise level on the property was not high except for the first 100 feet of the property by the road, that the area was already noisy with traffic and was going to get noisier when FM 1385 became a six-lane divided highway, that the noise had not affected Andrew's continued use of the pasture for cattle-grazing, and that Crosstex had done more than it needed "under the circumstances out there plus some." And it argued that the Gardiners presented two stories: "One story is that this is a rural area, it's the country, it should be quiet and kept that way. The other story is we want to wait till the land prices get to the right place and then we're going to sell it for something else to be here."

Here, other than complaining that it would be "wholly impossible" to sever out the evidence pertaining to an abnormal and out-of-place nuisance, which—as demonstrated above in our recitation of the evidence—it would not have been, and that the amendment would constitute unfair surprise, which—as also shown above in our recitation of the evidence—it could not reasonably have been, Crosstex offered no evidence of how it was actually prejudiced or surprised and did not argue that it otherwise would have had to change its trial posture if the amendment were granted. Under the circumstances presented above, adding the abnormal and out-of-place basis—one of three forms of culpability for creating a nuisance, *see Mathis*, 377 S.W.3d at 930—would have done no more than conform the pleadings to the evidence. Therefore, we hold that the trial

54

court should have allowed the trial amendment and that it abused its discretion by not doing so.

## IV. Conclusion

We overrule Crosstex's third issue and the part of its first issue pertaining to legal sufficiency. We sustain the part of Crosstex's first issue pertaining to factual sufficiency, reverse the trial court's judgment without reaching the rest of Crosstex's issues, *see* Tex. R. App. P. 47.1, and remand the case for a new trial and to allow the Gardiners to add the abnormal and out-of-place variation of their nuisance claim.

/s/ Bob McCoy

BOB MCCOY
JUSTICE

PANEL: GARDNER, WALKER, and MCCOY, JJ.

WALKER, J. concurs and dissents with opinion.

DELIVERED: November 13, 2014